UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **NANCY HOOKS,** | **2:21-CV-10743-TGB-KGA** |
| Plaintiff, | **OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NOS. 35/36)** |
| vs. | |
| **CITY OF WARREN, *et al.,*** | |
| Defendants. | |

On April 8, 2019, Nancy Hooks witnessed the beating of a teenager in Warren and tried to provide information to police officers who had responded to reports of a large-scale street brawl. The officers reacted negatively to her approach: They rejected her attempts at communication, one of them called her a "white trash bitch," and—as she backed away filming them—they decided to arrest her. During her arrest, she was slammed to the ground, causing her pants to slip down, and she was dragged away with her pants at her ankles. Later, she was charged criminally for hindering their investigation. After a Macomb County jury acquitted her of this charge, she sued the officers, the City of Warren, and the City of Warren Police Department, asserting multiple claims for violations of her constitutional rights and state law.

Defendants have moved for summary judgment on her claims. ECF Nos. 35/36. For the reasons below, the motion will be **GRANTED IN PART** and **DENIED IN PART**.

1

## I.   BACKGROUND

Nancy Hooks was 57 at the time of the event giving rise to this case. She uses hearing aids. Hooks Dep., ECF No. 36-12, PageID.739. On the evening of April 8, 2019, she set out in her truck from her home at Stephens and Lorraine in Warren to visit a girlfriend who lived some blocks away on Hudson and Lorraine. *Id.* at PageID.745. But she never made it there.

As Hooks drove south on Lorraine, she saw police cars leaving the intersection at Ford, three blocks away from her destination. *Id.* at PageID.749. She also recognized another of her friends standing at the corner, so she pulled over. This friend told Hooks that the police were leaving after arresting someone for shooting off a gun. *Id.* at PageID.748-49. When the two started chatting, the intersection was calm and no officers were left on scene. *Id.* at PageID.749. As they spoke, however, a group of 15 or 20 teenagers ran into the area and started beating up another teenage boy. *Id.*

Hooks called 911 to report the fight. *Id.* at PageID.750. She then got out of her truck to yell to the boy, who by this time was on the ground bleeding from facial injuries, that help was coming. *Id.* She testified that, at the mention of 911, the group of attackers immediately ran away. *Id.* Some five minutes later, police, firefighter, and EMS units began arriving. *Id.* Hooks recalls that initially three police cars responded to the

scene, but soon additional cars arrived, and "[t]here was a lot of police officers there." *Id.* at PageID.751.

Multiple 911 calls record citizens' reports about the attack. Defs. Exs. 2, 3, 4, 5, & 6. Dispatchers called for all available units to respond to the intersection of Ford and Lorraine. Defs. Ex. 7. This included the Defendants: Officers Marchelloe Brown, Anthony Giannola, Lucas Doe, and Bryan Munafo, who were then on their way back to the station to finish their 8:00 a.m. to 8:00 p.m. shifts, as well as Officer Andrew Koerner. Trial Tr. ECF No. 36-3, PageID.452-53 (Brown), PageID.510 (Giannola), PageID.543 (Doe); Munafo Dep., ECF No. 36-8, PageID.647. Some of these officers had previously responded to a shots-fired call from the area earlier in the day. Trial Tr., ECF No. 36-3, PageID.453 ("there was a shots fired call where we made an arrest...[s]everal hours prior [that] pretty much bled onto us … heading back to the station").

### A. Video Footage of Officer Response

Dashcam from Brown's vehicle shows that he sped to the scene and parked his car at 7:42 p.m. Def's Video Ex. 11, 04:36. When he arrived, there were already several police cars, officers, and a fire truck present. From the dashcam's vantage point, a group of some 10 people is visible on the northwest corner of Ford and Lorraine; a small number of observers stand on other corners. (Ford runs east and west; Lorraine runs north and south.) *Id.* at 04:56. The parties offer differing descriptions of what was happening at the scene. According to Hooks, "there was nothing

3

going on" and never more than 30 or 40 people present in total. Hooks Dep., ECF No. 36-12, PageID.753-54. Officers maintain there was "[a] large crowd … well in excess of 100 people … arguing with officers," *see, e.g.*, Trial Tr., ECF No. 36-3, PageID.454, and fights were breaking out. Brown Dep., ECF No. 36-10, PageID.682. From the video footage provided to the Court, it is not possible to confirm or dismiss either of these conflicting accounts.

Because the vantage point of the dashcam is too far from the location where Hooks encountered the police officers, the video does not clearly show what happened next. It does show that, after getting out of their cars, Officers Brown and Giannola stride towards the group, and Hooks—who is wearing a pink shirt with a dark jacket—approaches them. Koerner arrives with a K-9 unit. Only scattered remarks are discernible. Hooks can be heard saying, "It's terrible, yeah, I seen—I live up Stephens and Lorraine, I'm going down to Hudson—You know what? … You know why?" Def's Video Ex. 11, 05:01. An officer makes a comment about making sure nobody had weapons, and Hooks says, "You're not even looking for the kids—they're already on the block right there," while gesturing south down Lorraine. *Id.* at 05:18. An officer says, "What did they look like?" … "Well, that narrows it down." Hooks then gestures up and down the street and says, "I was a witness to this poor boy. I was [inaudible] up there, and all of the sudden, they all came. They were right there, and then they went right here, and then they started running—

4

and then they went—down this way, and then they're on the next block right here." *Id.* at 05:29.

While Hooks is speaking with Brown and Giannola, a woman comes up to the group and accuses officers of nearly running her and her daughter over. Giannola responds, "Well, get the fuck out the street then," which upsets the woman and causes her to start yelling. Officers can be seen gesturing at the woman and heard yelling at her, "Get in your house, you won't be told again. You can shut the fuck up." *Id.* at 05:48- 06:22. Some people (including the woman) disperse; Hooks and a few others continue speaking with officers. Officers can be heard making frustrated remarks like: "We leave for five minutes and then someone gets knocked out and no one is telling us who did it or where we can go…We come out here, okay, they told us they don't know, we come out here … I hear you, you seen it? Well, tell us what he's wearing, what he looked like, so we can go get him, and which way he went." *Id.* at 07:18.

The audio then becomes indiscernible, but Hooks can be seen standing in the intersection some feet away from officers, who are now gathered in their own huddle, waiting to speak to one of them. Some seconds later, she is able to speak to Giannola one-on-one in the intersection, still several feet from the group. Hooks starts to leave south across Ford but then turns around, takes a few steps towards Giannola, and can be heard saying, "White trash? White trash? I'm 57 years old, you're not gonna call me white trash." *Id.* at 07:47. No active fighting is

visible; the group on the corner has dwindled to some five individuals observing with their phones out. Hooks backs away from the officers west on Ford in the direction of this group, pulling her phone out and saying, "I'm gonna call your sergeant. Anybody else wanna call his sergeant? He called me white trash," while officers tell her, "Go home then, just go home … knock yourself out." *Id.* at 07:47-8:02.

After briefly pausing with her phone out, Hooks quickly walks south across Ford, towards her truck. Across the street, several feet away from where officers are gathered, she turns around and pulls out her phone again. *Id.* at 08:29. When Brown and Giannola see her standing on the corner filming them, they stride towards her to chase her away, yelling "GO!" *Id.* at 08:41.

Hooks complies and begins quickly walking away south down Lorraine to her truck. But at this point, Officers Doe and Munafo are walking north up Lorraine towards the intersection. Brown can be heard saying to them, "If she wants to move—if she doesn't leave—she can go!"

Cellphone footage taken by a bystander captures Hooks walking south towards her truck, seemingly oblivious that Doe and Munafo are approaching her. Def's Video Ex. 12, 00:50. As they meet, Officer Doe tries to grab her. *Id.* at 00:54. It's unclear whether he says anything to her. Hooks pulls away in what she says was shock and Doe says was a fighting stance, and Doe takes her to the ground on her back. Munafo

jumps into assist in turning her over, handcuffing her, and taking her away from the scene.

In total, less than four minutes elapse between Brown parking his car and Hooks being slammed to the ground. As she collides with the pavement, multiple people (including officers) exclaim, "Whoah! Whoah!" Def's Video Ex. 11, 08:45. On the dashcam footage, several officers (including Koerner and his K-9) can be seen walking away from the scene; on the cellphone video, other officers can be seen pushing observers back as Doe and Munafo drag Hooks away. *Id.* The bystander recording the events with his cell phone then moves west on Ford and captures footage of a large group of officers marching aggressively down the street. Def's Video Ex. 12, 04:50. They can be seen arresting a man standing in his front yard while bystanders exclaim, "Really?!" and comment that officers are arresting "the wrong people." *Id.* at 04:50-05:20.

### B. Conflicting Accounts of Events

Hooks and officers have different accounts of what the videos show.

According to Hooks, she approached officers as they arrived, wanting to show them the direction in which the attackers fled and to provide any information she could. Hooks Dep., ECF No. 36-12, PageID.751. But, she says, shortly after she began speaking with them, an officer (who we now know was Giannola) called her a "white trash bitch." *Id.* at PageID.752. She testified that, when she was told to leave, she was already starting to head towards her truck, but—because she

7

saw officers shoving a pregnant woman around—she faced officers as she backed away and tried to film. *Id.* at PageID.754-55.

Hooks testified that, as she headed towards her truck, Doe "came out from nowhere" and slammed her to the ground. *Id.* at PageID.755. She did not hear him say anything before he put his hands on her. *Id.* at PageID.760. She says that, during the takedown, her pants slipped down. *Id.* at PageID.760-61. She further said that, when she was pulled to her feet, she told officers she was in pain and repeatedly asked them to pull her pants up, but they ignored her and hauled her to a police van. *Id.* at PageID.761-63. She maintains she was never told why she was arrested. *Id.* at PageID.761.

Officers recall Hooks approaching them when they arrived and saying she was a witness. *See, e.g.*, Trial Tr., ECF No. 36-3, PageID.457-58. Initially they were interested in her information. But, they say, when Hooks said only that the attackers were black, they told her she had no pertinent information. *Id.* at PageID.458-59 (Brown), PageID.514 (Giannola). She then "kind of [fell] into the rest of the crowd or mob that was forming there." *Id.* at PageID.461.

Officers say their main job was "trying to keep the peace" and acknowledge that Giannola's use of vulgar language (like telling people to "get the fuck out of the street" and calling Hooks a "white trash bitch") had the opposite effect. *See, e.g.*, *id.* at PageID.479-81 (Brown), PageID.512 (Giannola). According to Giannola, he "didn't call [Hooks] a

name" but only muttered it under his breath out of frustration; he testified that it was "unfortunate" that she heard the comment. *Id.* at PageID.514; Giannola Dep., ECF No. 36-11, PageID.711. During depositions, officers acknowledged that use of such language breaches department policy and that they are generally obligated to notify supervisors about it. *See, e.g.*, Doe Dep., ECF No. 36-7, PageID.632.[1]

Though their entire interaction with her lasted less than four minutes from the point at which Brown parked his car, officers testified that Hooks was given several orders to leave "over a period of time" and "ample opportunity to leave." *See, e.g.*, Trial Tr., ECF No. 36-3, PageID.460-61; Koerner Dep., ECF No. 36-9, PageID.666, 673. They maintain that, though Hooks was leaving, she was "still turning and yelling" and "adding to the mob mentality"—though they admit she was about 15 feet away and "more than halfway up the street." Trial Tr., ECF No. 36-3, PageID.462, 490, 517-18. They cannot pinpoint any statements by her other than her remark that she would call the sergeant, and they admit she did not physically obstruct any of their actions, threaten anyone, or try to incite violence. *Id.* at PageID.488-89. They say Brown's

---

[1] At the criminal trial, they testified differently, maintaining that they didn't think such language violated any rules; it was "more unprofessional" than anything else and could cause a talk with a supervisor. Trial Tr., ECF No. 36-3, PageID.507. Later, in his deposition, Giannola maintained that use of such language "can deescalate" a situation. ECF No. 36-11, PageID.707.

exclamation that "She can go!" was police lingo that meant Hooks could be arrested. *See, e.g.*, *id.* at PageID.462, 491.

There is no evidence or any reason to believe that Hooks understood that an officer was ordering that she be arrested, or that she was told that she was being placed under arrest—or the reason for the arrest.

### C. *Procedural History*

After her arrest, Hooks was booked, and the next day she was charged with the municipal offenses of failing to obey a lawful command and hindering police officers. Misdemeanor Complaint, ECF No. 36-4, PageID.582; Warren Municipal Code § 22-22 (hindering) & § Sec. 22-23 (disobeying). Her husband was unable to immediately post her bond, so she spent four days in jail. Hooks Dep., ECF No. 36-12, PageID.777. She testified that, during this time, she repeatedly told jail staff that she was in pain and needed her medications, but she never received the medications or any medical attention. *Id.*

The charge for failing to obey a lawful command was voluntarily dismissed by the prosecutor. In November 2021, the City of Warren proceeded to trial against Hooks on the hindering charge. Officers Brown, Giannola, and Doe testified against her, and the City also introduced Brown's dashcam footage and the cellphone video taken by a bystander. *See generally* Trial Tr., ECF No. 36-3. The jury returned a verdict of not guilty in about 45 minutes.

Following her acquittal, Hooks filed this lawsuit against the City of Warren, the City of Warren Police Department, and Officers Doe, Munafo, Koerner, Giannola, and Brown. ECF No. 15. In a 42-page amended complaint, she asserts eleven causes of action:

- <u>Count I:</u> Unreasonable Search and Seizure – Excessive Force (42 U.S.C. § 1983) against all defendants;
- <u>Count II:</u> False/Wrongful Arrest – False Imprisonment against all defendants except Giannola and Brown;
- <u>Count III:</u> Unreasonable Search and Seizure – Denial of Medical Care (42 U.S.C. § 1983) against all defendants;
- <u>Count IV:</u> Municipal Liability – Ratification (42 U.S.C. § 1983) against all defendants;
- <u>Count V:</u> 42 U.S.C. § 1983 – Municipal/Supervisory Liability against the City of Warren;
- <u>Count VI:</u> Municipal Liability – Unconstitutional Customs or Policy (42 U.S.C. § 1983);
- <u>Count VII:</u> Battery against all defendants except Giannola and Brown;
- <u>Count VIII:</u> Gross Negligence as to all defendants except Giannola and Brown;
- <u>Count IX:</u> Intentional Infliction of Emotional Distress as to all defendants except Giannola and Brown;
- <u>Count X:</u> Malicious Prosecution as to all defendants; and
- <u>Count XI:</u> Abuse of Process as to all defendants except Giannola and Brown.

ECF No. 15.

Hooks says that, in the aftermath of her arrest, she has experienced extreme nerve pain, and she needed surgery to remove a nerve stimulator that was broken when Doe took her down. She still lives in the same house in Warren and often sees police officers patrolling the area.

Whereas she once respected them and viewed them as serving and protecting citizens, she now fears them.

With discovery complete, Defendants have moved for summary judgment on all of Hooks's claims. ECF Nos. 35/36. Hooks concedes that dismissal of her claims against the City of Warren Police Department, as well as her claim for abuse of process (Count XI), is appropriate but otherwise opposes the motion. ECF No. 40.

## II.    LEGAL STANDARD

A party is entitled to summary judgment if it "shows that there is no genuine to dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). No genuine material factual dispute exists if "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

At summary judgment, the Court construes the evidence in the light most favorable to the nonmoving party and draws all reasonable inferences in her favor. *Id.* The nonmoving party's evidence need not be in an admissible form. *Celotex v. Catrett*, 477 U.S. 317, 322 (1986). But she must "show that she *can* make good on the promise of the pleadings by laying out enough evidence that *will be* admissible at trial to demonstrate that a genuine issue on a material fact exists." *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).

### III.   DISCUSSION

Analysis of Hooks's claims will proceed chronologically, rather than in the order in which the parties discuss them.

### A. *Unlawful Arrest [Count II]*

The Court begins with Hooks's claim for unlawful arrest. Hooks brings this claim against all defendants but Brown and Giannola. To succeed on the claim, she needs evidence that the police lacked probable cause to arrest her. *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002). An officer determines the existence of probable cause by examining whether the facts and circumstances within his knowledge are sufficient to inform "a prudent person, or one of reasonable caution," that the suspect "has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). Probable cause can be based on an officer's belief that the arrestee has committed any crime, even if it is not the crime eventually charged. *Radvansky v. City of Olmstead Falls*, 395 F.3d 291, 307 n.12 (6th Cir. 2005).

Section 22-22 of the Warren Municipal Code defines the municipal offense of hindering and provides:

> (a) No person shall hinder, resist or oppose any city officer or employee, including police and firefighters, in the performance of their duties.
>
> (b) No person shall furnish to a police officer false, forged, fictitious or misleading verbal or written information identifying the person as another person, if the person is detained for a violation under the Warren Code of Ordinances.

13

(c)  Failure to comply with the provisions of this section shall result in the prosecution as a misdemeanor; upon the finding of guilt, the violator shall be subject to a term of imprisonment not to exceed ninety (90) days and/or a fine not to exceed five hundred dollars ($500).

(d) If any section, subsection, clause, phrase or portion of the section is for any reason held invalid or unconstitutional by any court of competent jurisdiction, such portion shall be deemed a separate, distinct and independent portion of this section and such holding shall not affect the validity of the remaining portions of this section.

It contains a reference to MCL § 750.479(1), the state-law offense of resisting or obstructing an officer in discharge of duty which, in relevant part, criminalizes:

(a) Assault[ing], batter[ing], wound[ing], obstruct[ing], or endanger[ing] a medical examiner, township treasurer, judge, magistrate, probation officer, parole officer, prosecutor, city attorney, court employee, court officer, or other officer or duly authorized person serving or attempting to serve or execute any process, rule, or order made or issued by lawful authority or otherwise acting in the performance of his or her duties.

(b) Assault[ing], batter[ing], wound[ing], obstruct[ing], or endanger[ing] an officer enforcing an ordinance, law, rule, order, or resolution of a common council of a city board of trustees, the common council or village council of an incorporated village, or a township board of a township.

"Obstruct" is defined as "use or threatened use of physical interference or force or a knowing failure to comply with a lawful command." MCL § 750.479(8)(a); *see also* MCL § 750.81d. This offense is a felony.

14

Section 22-23 of Warren's municipal code, meanwhile, defines the offense of disobeying a lawful command of a police officer and provides:

> No person shall refuse to obey the lawful command of any police officer, member of the national guard of the state, or member of the armed forces of the United States of America. No person shall fail to disperse when directed to do so by a police officer.

In asking for dismissal of the unlawful-arrest claim, Defendants observe that the standard of proof required to sustain a lawful arrest differs in kind and quantity from that which is necessary to sustain a criminal conviction. ECF No. 36, PageID.335. They argue that it is undisputed that Hooks was told to walk away at least six times and refused. *Id.* Moreover, they say, her arrest absolutely became justified when she attempted to strike Doe. *Id.* They urge that criminal charges were separately supported by an independent prosecutor and that the only reason Hooks's criminal case proceeded to trial was *because* there was probable cause in the first place. *Id.* at PageID.336.

But the fact that Hooks's trial proceeded through to verdict does not determine conclusively whether probable cause existed for purposes of this motion. And the prosecutor voluntarily dismissed the charge for disobeying a lawful order before the trial, cutting against the assumption Defendants ask this Court to make about the prosecutor's independent support for the charges. In the context of a criminal case, a court may choose to—and sometimes must—credit the testimony of officers over

15

conflicting testimony of other witnesses. *See, e.g.*, *Rainey v. Patton*, 534 F. App'x 391, 398 (6th Cir. 2013) (observing that standard for motion for acquittal in a criminal case differs from summary-judgment standard in a civil case by requiring trial court to view evidence most favorably to the State). In deciding a summary-judgment motion in a civil case, however, the Court may not do so and must view the evidence in the light most favorable to the non-moving party.

The Court has carefully reviewed the available videos, as "it makes little sense to waste time and effort" evaluating whether conflicting accounts present material fact questions if a video recording clearly confirms or refutes one account over the other. *Bell v. City of Southfield*, 37 F.4th 362, 364 (6th Cir. 2022). But, though the Court may rely on video evidence to the extent that it "blatantly contradict[s]" an account of an opposing party, *Scott v. Harris*, 550 U.S. 372, 380 (2007), it may not do so when a video is unclear and susceptible to differing interpretations. And here, the available video evidence is not clear enough to resolve any of the factual disputes one way or another.

*First*, because of the dashcam's vantage point and the distance between Brown's vehicle and the spot where Hooks interacted with officers, the dashcam video neither confirms nor refutes whether the scene was controlled or chaotic. It may be true, as Defendants assert, that the scene they encountered was "chaotic" and involved upwards of 50 or 100 people yelling and starting fights. But no active fighting appears in

16

the video, and only about 10 to 15 people can be seen standing on the corner. Dashcam footage captures people beginning to yell only after officers appear to escalate the situation themselves by telling citizens to "get the fuck out of the street" and to "shut the fuck up." It is not clear that Hooks was one of the individuals who began yelling. (Indeed, she appears to step into the intersection to get away from the yelling.)

*Second*, the footage is even less clear whether Hooks's behavior after her one-on-one encounter with Giannola was disobedient. Def's Video Ex. 11, 07:43. Giannola says he only muttered the epithet "white trash bitch" under his breath out of frustration; Hooks, however, is hard of hearing, and she testified that Giannola called her that name only seconds into their interaction. According to officers, when they tried to diffuse the scene by telling Hooks to leave, she walked back and forth—screaming, riling up the crowd, and running up on officers who had their backs turned despite multiple warnings to leave "over a period of time." None of this is clearly captured on video, and the entire encounter from when Brown first parked his car until Hooks was forced to the ground lasted under four minutes. Hooks, meanwhile, maintains that she only said she would call a sergeant as she started to leave. *Croland v. City of Atlanta*, 782 F. App'x 753, 758 (11th Cir. 2019) (holding that, by 2014, the law was clear that yelling about police harassment in front of a crowd—by itself—did not give rise to arguable probable cause).

If the officers' version of the events regarding the state of the scene and Hooks's conduct is true, then they indeed had probable cause to arrest her for failing to disobey a lawful order. But if Hooks's account that she was complying with commands and simply trying to film from a distance is true, they did not, and the video does not clearly confirm or refute either account. *See, e.g.*, *Charles v. City of New York*, No. 12-06180, 2017 WL 530460, at *17 (E.D.N.Y. Feb. 8, 2017) (concluding summary judgment was inappropriate on claim for unlawful arrest of bystander where evidence conflicted whether she was "screaming, yelling" or asked questions in a "slightly raised" voice).

*Finally*, there is the confusing matter of Brown's order to Doe and Munafo: "She can go!" Officers now assert this was police lingo meaning that Hooks could be arrested. A juror could accept this as true, which would mean that Doe and Munafo were simply following orders. But a juror could also conclude that Doe and Munafo ignored a directive to allow Hooks to leave. The Court doubts that most citizens would understand the phrase "She can go!" as anything but permission to leave the scene; it does not seem reasonable to expect citizens to understand such a statement to mean, "Stop, you are under arrest."

Defendants retort that summary judgment is still appropriate because, even if Hooks was not disobeying orders to leave the scene, they developed probable cause to arrest her when she resisted Doe's efforts to detain her. But, again, from available video footage, it is less than clear

whether (as Doe says) he told her she was going to jail or (as Hooks says) Doe "came out of nowhere" and put his hands on her without warning. Nor is it clear whether she obviously resisted and attempted to strike Doe after being told she was going to jail or simply startled and reflexively jerked away at unexpected physical contact. So relying on Hooks's alleged resistance as probable cause for arresting her does not help defendants.

Of course, qualified immunity would protect officers if their conduct did not violate clearly established rights. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Qualified immunity is designed to give officers "breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations omitted). "[W]hether an official … may be held personally liable for an allegedly unlawful action generally turns on the objective legal reasonableness of the action … assessed in light of the legal rules that were clearly established at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (citations and quotations omitted). In the context of unlawful-arrest claims, officers are entitled to qualified immunity if it is arguable whether they had probable cause. *Haywood v. Hough*, 811 F. App'x 952, 961 (6th Cir. 2020).

But at best, on this record, it is arguable whether it is even arguable that officers had probable cause. A jury will need to determine whether to credit officers' accounts that the scene was so chaotic they reasonably

19

could mistake Hooks's actions as disobedience or whether they simply were angry that she was trying to record their conduct on her phone. A jury will need to interpret whether Brown's exclamation that "She can go!" was an order for Hooks to be arrested or a directive to allow her to walk away. Officer testimony undercuts the notion that an officer would be acting reasonably by arresting her if her account is true. Officers admit Hooks did not physically hinder them, scream any threats, or attempt to incite violence. ECF No. 36-3, PageID.488. As noted above, the only specific words any officer can pinpoint from her are her statements about calling a sergeant after she was called a "white trash bitch." *Id.* at PageID. 489. She does not scream or yell this; her voice is only slightly raised. And she cannot be heard to say much of anything at all after that statement. Officers also testified that simply filming from a distance would not constitute hindering. That is all Hooks says she did.

In *Lyons v. City of Xenia*, 417 F.3d 565, 575 (6th Cir. 2005), the Sixth Circuit concluded that officers reasonably arrested a bystander where there was evidence of "profanity-laced yelling and finger-pointing at the officer, as well as … disruptive character of … speech—*i.e.*, its volume, demeanor, etc." But in *Rainey v. Patton*, 534 F. App'x 391, 399 (6th Cir. 2013), the Sixth Circuit denied qualified immunity to officers for arresting a bystander where the bystander stood several feet away from officers as they made an arrest, "[h]is only communication with [officers] was in response to their queries," and he was never told that he was

20

interfering. Other courts have made clear that "[r]ecording police activity, by itself, supplies no probable cause for an arrest." *Flores v. Rivas*, No. 18-00097, 2019 WL 5070182, at *4 (W.D. Tex. Aug. 11, 2019); *see also Ibarra v. Harris Cty.*, 243 F. App'x 830, 834 (5th Cir. 2007) ("[T]aking photographs of police activity is not, in and of itself, a criminal act."). They have further concluded that it was clearly established even in 2011 that a citizen cannot be arrested for simply filming an officer. *Glik v. Cunniffe*, 655 F.3d 78, 88 (1st Cir. 2011) (no qualified immunity for officers who arrested bystander filming arrest).

There remains the issue of which defendants are proper defendants to this claim. In her amended complaint Hooks has not asserted this claim against Brown or Giannola. Because Hooks has asserted separate claims for municipal liability against the City of Warren, Warren will be dismissed as to this claim. Koerner must also be dismissed, as he can clearly be seen on video standing across the street from the arrest, trying to control his K-9. *See White v. Goforth*, No. 22-5409, 2023 WL 3546527, at *3 (6th Cir. May 18, 2023) (noting that "[s]uccessful failure-to-intervene claims are rare and limited to one context—the use of excessive force"). But summary judgment is inappropriate as to Doe and Munafo, so their motion will be **DENIED** as to this count.

### B. Excessive Force and Battery Claims [Count I & VII]

The Court turns next to the excessive force and battery claims. Defendants contend these claims must be dismissed because all Officer

Doe did was "utiliz[e] muscling techniques to take Plaintiff to the ground," which was objectively reasonable given Hooks's attempt to strike Doe. ECF No. 36, PageID.340.

### 1. Excessive Force under the Fourth Amendment

The Fourth Amendment protects the right to be free from "excessive force during an arrest." *LaPlante v. City of Battle Creek*, 30 F.4th 572, 579 (6th Cir. 2022). Whether an officer's use of force violates the Fourth Amendment hinges on "whether the officers' actions are objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989). This inquiry is objective and takes place from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Goodwin v. City of Painesville*, 781 F.3d 314, 321 (6th Cir. 2015) (quotations omitted). "[N]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." *Alexandre v. Ortiz*, 789 F. App'x 169, 174 (6th Cir. 2019) (quotations omitted).

Several factors bear on whether an officer's actions are reasonable, including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Sigley v. City of Parma Heights*, 437 F.3d 527, 534 (6th Cir. 2006). Generally, a police officer may use reasonable force—like striking somebody—to subdue a suspect who is actively resisting arrest. *See Rudlaff v. Gillispie*, 791 F.3d 638, 641-42 (6th Cir. 2015).

Viewing the record in the light most favorable to Hooks, the Court cannot conclude that any of these factors justify the use of force exercised in this case.

As to the severity of the crime at issue, it is disputed whether there was probable cause to suspect Hooks of any crime or infraction at all. And hindering—as it is alleged to have taken place here—is not a violent or serious crime. There is no clear video evidence that any officer told Hooks that she was under arrest. According to Hooks, Doe "came out of nowhere" as she was attempting to comply with a command to leave, put his hands on her, and—when she startled—slammed her to the ground. Seconds before the arrest, Brown can be heard on the dashcam audio shouting, "She can go!" Even if the Court views the record in the light most favorable to the officers—which it may not do—and interprets this confusing command as a directive to arrest Hooks, the arrest was for the municipal infraction of disobeying a command to leave. Hooks was not being arrested for a "violent or serious crime, and this fact weighs in favor of using less force in arresting someone." *Bozung v. Rawson*, 439 F. App'x 513, 520 (6th Cir. 2011) (quotations omitted).

The next consideration is whether Hooks posed an apparent threat. Even by officers' accounts, Hooks was not yelling threats or inciting violence. She was an unarmed, 57-year-old, 150-pound woman. Though she was upset at being called "white trash," "when police are confronted by an unarmed, emotionally distraught individual who has committed no

23

serious crime, as opposed to an armed and dangerous criminal, the governmental interest in using force is diminished, not strengthened, even when the suspect is irrational and inviting the use of force." *Landis v. Baker*, 297 F. App'x 453, 466 (6th Cir. 2008) (quotations omitted). In this case there is no evidence that Hooks was irrational or inviting the use of injurious force, and she appeared to be complying with officers' directions to leave when she was forcibly arrested.

Finally, it is unclear from the video evidence whether Hooks's reaction to being arrested can fairly be interpreted as actively or even apparently resisting arrest. Doe says that, at some point either before or while he physically contacted Hooks, he told her, "You're going to jail"— and only after she pulled back into a "bladed" fighter's stance did he "utilize muscling techniques" to "escort" her to the ground. Hooks says that Doe "came out of nowhere" and gave her no warning before putting his hands on her, causing her reflexively to startle, before he forcefully slammed her on the ground.

Of course, officers would be entitled to qualified immunity for using force if they could reasonably interpret any of Hooks's actions as an attempt at resistance during a chaotic scene. But factual disputes preclude an award of qualified immunity in this case. From the available footage, it is not readily apparent whether Hooks's reaction on her first physical contact with Doe was such that—in the kind of split-second

decision officers are often called upon to make—Doe reasonably could have mistaken her startled movements as an attempt to strike him.

The Sixth Circuit has instructed that, "[e]ven if a situation is tense, uncertain, and rapidly evolving, that does not inoculate an officer from a charge that he crossed the line from subduing an individual to assaulting him." *Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008) (quotations omitted). Case law makes clear that there is no government interest in tackling someone who is compliant and not attempting to flee. *Pershell v. Cook*, 430 F. App'x 410, 415 (6th Cir. 2011) (knocking suspect to the ground was unreasonable when suspect "did not resist arrest or pose an immediate danger to officers"); *Lawler v. City of Taylor*, 268 F. App'x 384, 386-87 (6th Cir. 2008) (officer's use of force in throwing suspect to the floor was disproportionate to any threat he faced, given that suspect had merely insulted officer and "raised his left arm slightly").

A reasonable juror viewing the footage could conclude that 57-year-old Hooks was not given much of a chance to comply peaceably because she was not told that she had committed a crime or was being arrested. A jury could reasonably find that Hooks did not offer any apparent attempt to resist Doe's efforts to detain her and that Doe's decision to slam her on the ground when she startled at his physical contact was unreasonable and excessive. Such a conclusion would be bolstered by the fact that Hooks was unarmed and apparently compliant with officer commands until the moment Doe laid hands on her, when she appears to

react in surprise. Long before the events of this case in 2019 a reasonable officer would have been "on notice that using severe force … against an unarmed and minimally threatening individual *before* [s]he was subdued violates the constitution." *Martin v. City of Broadview Heights*, 712 F.3d 951, 962 (6th Cir. 2013); *see also Moser v. Etowah Police Dep't*, 27 F.4th 1148, 1153 (6th Cir. 2022) ("By September 2017, it was clearly established in this circuit that a person has constitutional right to be free from injury-threatening physical force when he or she is not actively resisting the police.").

Again, because of the manner in which Hooks has pleaded her complaint, there remains the issue of which defendants are proper to this claim. She raises this claim against all defendants. But only Doe was involved in the physical takedown. Koerner appears to be walking away when it happened, and Giannola and Brown are obviously several feet away from it. And there is no evidence, in the form of testimony by Hooks or otherwise, that Munafo used any force other than that which was necessary to assist Doe after Hooks was already on the ground.

To the extent Hooks seeks to proceed on this claim against defendants other than Doe on a theory of failure to intervene, she lacks evidence that they had a sufficient opportunity to intervene. "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer

26

had both the opportunity and the means to prevent the harm from occurring." *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997). "Where an act of excessive force unfolds in a matter of seconds, the second requirement is generally not satisfied." *Pennington v. Terry*, 644 F. App'x 533, 548 (6th Cir. 2016) (noting that there is generally insufficient time to intervene in types of excessive force lasting less than ten seconds). Video evidence shows that far less than ten seconds elapsed between Doe's first physical contact with Hooks and the point when he slammed her to the pavement. Indeed, his action was swift—almost instantaneous.

Accordingly, summary judgment will be **GRANTED** in favor of all Defendants except Doe.

2. <u>Battery</u>

Michigan defines battery as "an intentional, unconsented and harmful or offensive touching of the person of another, or of something closely connected with the person." *People v. Nickens*, 685 N.W.2d 657, 661 (Mich. 2004) (quotations omitted). Defendants appear to accept that, even as officers, they can be held liable for battery but assert they are entitled to governmental immunity on this claim.

The Governmental Liability for Negligence Act, MCL § 691.1407, gives officers who believe they are acting reasonably in the discharge of their duties immunity from torts. In relevant part, it provides:

> [W]ithout regard to the discretionary or ministerial nature of the conduct in question, each officer … of a governmental agency … is immune from tort liability for an injury to a

person or damage to property caused by the officer … if all of the following are met:

   a. The officer … is acting or reasonably believes he or she is acting within the scope of his or her authority.
   b. The governmental agency is engaged in the exercise or discharge of a governmental function.
   c. The officer's .. conduct does not amount to gross negligence that is the proximate cause of the injury or damage.

MCL § 691.1407(2). These provisions require officers invoking them to establish: (1) that they reasonably believed they were acting within the scope of their authority; (2) they undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008). The statute defines "gross negligence" as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." MCL § 691.1407(8)(a).

Though there are some differences between qualified immunity and Michigan statutory governmental immunity—qualified immunity uses an objective standard to evaluate reasonableness, for instance, while Michigan uses a subjective one and "protects a defendant's honest belief and good-faith conduct … while exposing to liability a defendant who acts with malicious intent," *see e.g.*, *Odom*, 760 N.W.2d at 229—those differences are immaterial here. The Court's analysis of the battery claim thus parallels its analysis of the excessive force claim.

Accordingly, as to this claim summary judgment is **GRANTED** as to each Defendant except for Doe.

### C. Denial of Medical Care [Count III]

Defendants next contend that the claim for denial of medical care must be dismissed because the only injury Hooks has complained of is "back pain, which was not known or readily observable," and she "does not have an iota of evidence to support that this need was sufficiently serious." ECF No. 36, PageID.338. Further, Defendants say that Hooks never testified that she asked any officer for medical care, and they note that in their own testimony they continually maintained that they did not know she was injured. ECF No. 36, PageID.338.

Claims for the denial of medical care by officers during early detention arise under the Fourteenth Amendment. *Colson v. City of Alcoa, Tenn.*, 37 F.4th 1182, 1187 (6th Cir. 2022) To maintain such a claim, Hooks needs evidence that: (1) she had an objectively serious medical need, and (2) defendants possessed a "sufficiently culpable state of mind in denying medical care." *Gomez v. City of Memphis*, No. 21-5473/5644, 2023 WL 7287100, at *4 (6th Cir. Aug. 4, 2023) (quotations omitted). In the context of pretrial detainees, an officer possesses a sufficiently culpable state of mind in denying medical care when he or she acts deliberately and recklessly in the face of an unjustifiably high risk of harm that is either known to the officer or so obvious that it should be known. *Helphenstine v. Lewis Cty.*, 60 F.4th 305, 317 (6th Cir. 2023).

Defendants' suggestions that the injuries Hooks suffered were not objectively serious are not well-taken. She testified that she was injured

29

so badly that her doctors later needed to perform surgery to remove a nerve stimulator they had previously placed in her because the force of the collision broke the device. Since the incident, she has continually been in pain, and she can no longer do basic tasks like shopping. This sort of testimony places her injuries well into the "objectively serious" realm. The objective element of a medical-care claim is met when a serious medical need "has been diagnosed by a physician as mandating treatment." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004) (quotations omitted).

Nonetheless, the Court agrees with Defendants that Hooks lacks evidence creating a fact dispute over whether officers had reason to appreciate that failing to provide immediate medical care created an unjustifiable risk of harm to Hooks. To be sure, a reasonable person likely would know that slamming a 57-year-old woman to the ground carries a risk that she will be injured. But Hooks lacks evidence that, after she was able to stand up and was placed in the van, officers had reason to know that her condition was grave enough to require immediate attention. And they cannot be held liable for what happened later at the jail.

Accordingly, Defendants' motion is **GRANTED** as to this claim.

### D. Intentional Infliction of Emotional Distress

Defendants next argue that Hooks's claim for intentional infliction of emotional distress must be dismissed because their conduct was not severe enough to be considered outrageous. ECF No. 36, PageID.342-43.

To maintain this claim, Hooks needs evidence of conduct so outrageous as to go beyond all possible bounds of decency. "Liability does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." *Doe v. Mills*, 536 N.W.2d 824, 833 (Mich. Ct. App. 1995). The test is whether "the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" *Roberts v. Auto-Owners Ins. Co.*, 374 N.W.2d 905, 909 (Mich. 1985) (quotations omitted). Whether a defendant's conduct meets this threshold is a question of law for the court. *Teadt v. Lutheran Church Missouri Synod*, 603 N.W.2d 816, 824 (Mich. Ct. App. 2000).

If Hooks's only evidence was that officers swore at her and called her a "white trash bitch" before lawfully arresting her, defendants would be correct that such conduct—while deplorable from officers sworn to protect the public and serve citizens—would be insufficient to sustain the claim. The Michigan Supreme Court has explained that "[t]he rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." *Roberts*, 374 N.W.2d at 909 (quotations omitted).

But Hooks has more than that. Viewed in the light most favorable to her, the record contains evidence that officers forcefully slammed her

to the ground for merely recording them as she was leaving the scene after being told, "She can go!"—then dragged her away with her pants down for all the street to see as she pleaded with them "over a hundred times" to please pull her pants up. The Michigan Supreme Court has suggested that situations involving false arrest and public humiliation may qualify as extreme and outrageous. *Roberts*, 374 N.W.2d at 915. The Court concludes that slamming a 57-year-old, unarmed woman who poses no obvious threat to the ground and then dragging her away with her pants down in a public street is conduct that, when described to an average community member, would cause him to exclaim, "Outrageous!" (Indeed, there is evidence that Hooks's treatment prompted just such a reaction. *See* Def's Video Ex. 12.)

Defendants' motion is **DENIED** as to this claim. Because only Doe and Munafo dragged Hooks away, however, the motion is **GRANTED** as to the other defendants, and the claim will be dismissed as to them.

### E. Malicious Prosecution [Count X]

Defendants next contend that they are entitled to summary judgment on the malicious prosecution claim because Hooks has no evidence that they had anything to do with the decision to bring charges against Hooks. ECF No. 36, PageID.343.

The Sixth Circuit recognizes malicious prosecution as a claim under the Fourth Amendment that is distinct from a claim for false arrest. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). To succeed on such

a claim, a plaintiff must show that: (1) a defendant participated in the decision to prosecute a criminal case; (2) there was no probable cause for the prosecution; (3) because of the prosecution, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceedings resolved in the plaintiff's favor. *Id.* at 308-09. Malice is not an element. *Id.* (This has led the Sixth Circuit to remark that the "malicious prosecution" moniker is unfortunate and a better one might be "unreasonable prosecutorial seizure." *Id.* at 310.) Officers cannot avoid liability simply because they lack authority to make an ultimate charging decision; "the fact that they did not *make* the decision to prosecute does not per se absolve them from liability." *Id.* at 312.

Defendants' argument that they cannot be liable for any of the criminal proceedings depends on crediting their assertions that they had probable cause to arrest Hooks and later provided truthful information to prosecutors and testified truthfully in state court. But these facts are disputed, which means they must be resolved by a jury. In determining whether a material fact issue exists, the Court must credit Hooks's account that the officers lacked probable cause to arrest her, lied in their reports, and testified falsely against her. If a jury found Hooks's account to be true, in combination with her evidence that she was detained for four days on charges of which she was ultimately acquitted, that would be sufficient to support a finding of liability for malicious prosecution.

Defendants' motion for summary judgment is therefore **DENIED** as to this claim. But only Munafo wrote the allegedly false report, and only Brown, Giannola, and Doe testified in court. The other defendants will therefore be dismissed from this claim.

### F. Gross Negligence [Count VIII]

Defendants argue that they are entitled to summary judgment on Hooks's claim for gross negligence because it is "fully premised" on her other intentional tort claims. ECF No. 36, PageID.341.

Michigan courts have repeatedly "rejected attempts to transform claims involving elements of intentional torts into claims of gross negligence." *See, e.g.*, *VanVorous v. Burmeister*, 687 N.W.2d 132, 143 (Mich. Ct. App. 2001), *overruled on other grounds*, *Odom v. Wayne County*, 760 N.W.3d 217 (Mich. 2008); *see also Bletz v. Gribble*, 641 F. 3d 743, 756 (6th Cir. 2011) (recognizing as much).

Hooks opposes dismissal of this claim but does not provide any coherent argument that addresses the state of Michigan law.

Accordingly, Defendants' motion is **GRANTED** on this claim.

### G. Monell *Claims [Counts IV, V, & VI]*

Finally, Defendants contend that the *Monell* claims against the City of Warren must be dismissed. ECF No. 36, PageID.343-47.

A municipality like Warren cannot be held liable under § 1983 for an injury inflicted solely by its employees. *Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005). But it may be sued when

its official "policy or custom" triggers a violation of a plaintiff's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694-95 (1978). A plaintiff can establish such an unconstitutional custom or policy by producing evidence that shows: (1) the existence of an illegal official policy; (2) that an official with final decision-making authority ratified illegal actions; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal rights violations. *Thomas*, 398 F.3d at,429.

Hooks has no evidence of any illegal official policy. Warren, meanwhile, has submitted evidence of written policies prohibiting the use of coarse and vulgar language and governing police use of force. *See, e.g.*, ECF No. 36-6, PageID.591 (explaining that officers "shall be tactful in the performance of their duties, shall control their tempers, [shall] exercise the utmost patience and discretion," and "shall not use coarse, violent, profane or insolent language"); PageID.614-16 (making clear that "only NECESSARY force is justified," instructing officers not to escalate situations, and explaining with reference to required training what uses of force would be appropriate according to subject's resistance (emphasis in original)). So the *Monell* claims can proceed only if Hooks has evidence that Warren ratified the officers' conduct, failed to train its employees, or had a custom of tolerating civil rights violations. She does not attempt to argue the latter theory.

1.  Ratification

To succeed on a "ratification" theory, Hooks needs evidence "that an official with final decision-making authority ratified the conduct." *Mosier v. Evans*, 90 F.4th 541, 549 (6th Cir. 2024). Ratification may take the form of a failure to investigate, if there have been "multiple earlier inadequate investigations [that] concern comparable claims." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 495 (6th Cir. 2020) (quotations omitted).

Hooks has presented no such evidence, nor does she address who "the official with final decision-making authority" might be. In an effort to create a factual dispute, she has submitted an expert report from Scott A. DeFoe, a retired law enforcement official who now consults as a use-of-force expert. ECF No. 40-1, PageID.906. His summary of the records that he reviewed in preparing his report suggests the *opposite* of a failure to investigate, as it details past suspensions of officers for excessive use of force. ECF No. 40-1, PageID.896-98.

2.  Failure to Train

To succeed on a failure to train claim, Hooks needs evidence that: "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

36

Showing deliberate indifference requires evidence that a municipality "completely disregarded" its duty to train. *Harris v. City of Saginaw*, 62 F.4th 1028, 1038 (6th Cir. 2023). Typically, this means inaction in the face of repeated, known violations. *Shadrick v. Hopkins Cty.*, 805 F.3d 724, 738-39 (6th Cir. 2015). In a "narrow range of circumstances," when a rights violation is a "highly predictable consequence" of inadequate training, repeated rights violations need not be shown. *Id.* at 739. But in those cases, the risk of rights violations must be "so obvious" and inadequate training "so likely" to result in such violations that the municipality can be fairly described as deliberately indifferent. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

Hooks lacks sufficient evidence to create a material factual dispute as to this theory. True enough, she has submitted DeFoe's report, which broadly concludes that, *based on their actions*, officers did not receive adequate training on de-escalation techniques or crowd control and management. But there is no evidence that the City of Warren failed entirely to train its officers. And Hooks lacks evidence that the City of Warren was deliberately indifferent to the need for training. Instead, the record contains evidence that all officers received training on several topics, including de-escalation and use of force. ECF No. 36-7, PageID.628; ECF No. 36-10, PageID.681 ("There's programs where we get our general orders pretty much shown to us on a computer. … They've … given us PowerPoint presentations in our forty-hour training that we

37

do annually. And we have had training on de-escalation.") DeFoe's opinion that this training was inadequate is conclusory and does not appear to be informed by a review of what it actually contained, so it is not enough to create a material factual dispute. And Hooks lacks evidence of repeated complaints that would signal to Warren that its training was inadequate. *See Mosier*, 90 F.4th at 550 ("In situations like this, where relevant training was given, showing that 'additional training would have been helpful' does not establish municipal liability.").

Proving a *Monell* claim against a municipality is no easy task, often requiring volumes of evidence of prior constitutional violations and efforts to show that high-ranking officials had actual or constructive notice of those violations and took no action. Hooks's efforts to proceed on her *Monell* claims do not meet this high bar. Accordingly, Defendants' motion is **GRANTED** with respect to these claims.

## IV.   CONCLUSION

The police-citizen interactions presented in the record of this case fall below the standards of professionalism and service that American citizens have a right to expect from their government. Whether the actions by the police here amounted to constitutional or state-law violations will require a jury to resolve several disputed facts.

For the reasons set out above, Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART.** The following claims remain in this case:

38

- <u>Count I:</u> § 1983 excessive force claim against Doe;
- <u>Count II:</u> § 1983 unlawful arrest claim against Doe and Munafo;
- <u>Count VII:</u> battery claim against Doe;
- <u>Count IX:</u> emotional distress claim against Doe and Munafo; and
- <u>Count X:</u> malicious prosecution claim as Doe, Munafo, Brown, and Giannola.

Koerner, Warren, and the Warren Police Department are hereby **TERMINATED** as Defendants.

     **SO ORDERED**, this 30th day of March, 2024.

                                  BY THE COURT:

                                  /s/Terrence G. Berg
                                  TERRENCE G. BERG
                                  United States District Judge